Filed 8/3/22  In re L.A.-O. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.A.-O. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.A. et al., Defendants and Appellants. | E078671 (Super.Ct.Nos. J279705, J279706 and J285540) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant M.A.

Jill S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant A.O.

1

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

M.A. (mother) and A.O. (father) appeal from an order terminating — for the second time — their parental rights to their three children.

In 2021, at a hearing pursuant to Welfare and Institutions Code section 366.26,[1] the juvenile court found that the parental-benefit exception (§ 366.26, subd. (c)(1)(B)(i)) did not apply and terminated parental rights.  The parents appealed.  We reversed; we directed the juvenile court to reconsider its finding regarding the parental-benefit exception.

On remand, before our remittitur issued, the parents requested visitation, and the mother requested a bonding study; the juvenile court denied both requests.  After our remittitur issued, it held a new section 366.26 hearing.  Once again, it found that the parental-benefit exception did not apply, and once again, it terminated parental rights.

The parents[2] contend that:

(1)  The juvenile court violated due process by denying a bonding study and visitation.

(2)  The juvenile court violated due process by admitting and considering a social worker's report filed after the first section 366.26 hearing.

---

**1** All further statutory citations are to the Welfare and Institutions Code, except as otherwise indicated.

**2** Each parent joins in the other's contentions.

(3) The juvenile court violated due process by prejudging the parental-benefit issue.

(4) The evidence does not support the juvenile court's finding that the parental-benefit exception did not apply.

We find no error — or, at least, no error that has been preserved for appeal. Hence, we will affirm.

I

STATEMENT OF THE CASE

A. *The First Section 366.26 Hearing*.

The parents have three children together: N.A.-O (N.), a son, born in 2014; G.A.-O. (G.), a daughter, born in 2015; and L.A.-O. (L.), a daughter, born in 2020.

In February 2019, Children and Family Services (CFS) obtained detention warrants for N. and G. and filed dependency petitions concerning them.. In June 2020, after L. was born, CFS detained her and filed a dependency petition as to her. The concerns about the family included methamphetamine abuse, neglect of the children's hygiene, and a filthy home.

The juvenile court found that it had jurisdiction over all three children based on failure to protect (§ 300, subd. (b)), and additionally, over L., based on failure to support and abuse of a sibling. (§ 300, subds. (g), (j).)

In August 2020, the juvenile court terminated reunification services as to N. and G. In February 2021, it terminated reunification services as to L. and set a section 366.26 hearing as to all three children.

In June 2021, at the section 366.26 hearing, the juvenile court found that the children were adoptable and that there was no applicable exception to termination of parental rights. It therefore terminated parental rights.

The parents appealed.

B. *The Post-Permanent Plan Review Hearing*.

While the appeal was pending, the juvenile court held a post-permanent plan review hearing. In connection with that hearing, CFS submitted a post-permanent plan review report dated December 2021 (PPR report). Because the parents' rights had been terminated, they had no right to a copy of the PPR report before the hearing, and they did not attend the hearing; at the hearing, the juvenile court ordered their counsel relieved.

C. *Our Opinion in the Previous Appeal*.

We issued our opinion on December 27, 2021. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197.) In it, we reversed the order terminating parental rights. We held that the trial court's finding that the parental-benefit exception did not apply was ambiguous; it could be understood as complying — but also as not complying — with *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). (*In re L.A.-O.*, *supra*, at pp. 208-212.) We directed the trial court, on remand, to "reconsider the application of the parental-benefit exception in light of *Caden C.* and this opinion." (*Id*. at p. 212.)

4

D.     *The Special Hearing*.

On February 4, 2022, the juvenile court held a "special hearing."

It began by commenting, "The remittitur isn't final yet, so technically I don't even have jurisdiction yet. But I put it on so we can discuss it and how we're procedurally going to proceed."

The mother's counsel replied: "[I]f I can just make some requests. I do understand that we may not be able to do those since the remittitur is not done, but at least if I can voice those requests and we can address them at the next hearing." She said the mother would be requesting visitation and a bonding study. The father's counsel joined in the mother's request for visitation.

Minor's counsel said, "With respect to the request for visits, I mean obviously I'm not going to object to that necessarily." However, counsel for CFS did object to visitation, on the ground that the juvenile court did not yet have jurisdiction. She also objected to a bonding study, because (1) "the Court has authority to deny a bonding study at a .26," and (2) a bonding study would not be "helpful to the Court," because the parents' visits were "of poor quality" and the parents had not visited for eight months.

The juvenile court ruled: "I don't have jurisdiction at this point . . . . I mean, I can set a hearing. But also I don't believe it's in the children's best interest to order visits. I think it would be confusing to them based on the evidence that I heard. I don't believe there is the substantial bond under *Caden C*." "I think it would be confusing to the kids to have stopped visits, start them again, and it's certainly not in their best interest."

5

"I also don't believe a bonding study based on the evidence I already heard would be appropriate again. I think it would be more damaging than helpful, so I'm going to deny the request for a bonding study. I don't think it would help me decide the issue at all."

The juvenile court also commented, "I believe the parties are in agreement to set a new .26 hearing after the remittitur is filed, at which time I would either listen to any testimony or argument on the parental bond exception." "I don't believe we even need a new .26 based on the language of the remand . . . . But if everyone agrees that that's the safer course, I'll do it. [¶] I think the evidence is what it is and what I heard already." It set a new section 366.26 hearing for March 11, 2022.

On March 1, 2022, we issued our remittitur.

E.      *The Second Section 366.26 Hearing*.

On March 11, 2022, at the second section 366.26 hearing, counsel for CFS offered five specified reports (but not the PPR report) into evidence.[3]

The mother's counsel once again requested visitation and a bonding study and requested a continuance for that purpose. Once again, the juvenile court denied the request.

---

[3]      The juvenile court also said, "I will take judicial notice of any reports that exist in the file." However, it suggested that counsel for CFS had already introduced them; she agreed. Thus, it does not appear that it took judicial notice of the PPR report, which she had not yet introduced.

The mother sought to introduce some letters and photos, but the trial court excluded them. Otherwise, the parents did not seek to introduce any evidence. Thus, the juvenile court proceeded to hear argument. Minors' counsel said: "[T]here's been zero evidence presented to the Court today that the children have somehow been suffering detriment as a result of that termination. Which, if there was, in fact, this beneficial relationship [such that termination] would be detrimental to the children, you would expect the parents to have produced that evidence."

The juvenile court found that the children did not "have a substantial positive emotional attachment to the parents . . . ." It agreed with minors' counsel — "I don't have any evidence that the kids are suffering from not having contact with the parents. In fact, I had a PPR in December where none of that evidence was in existence." "[T]he benefits of adoption far outweigh any detriment, if there is any, to the children in terminating parental rights." It therefore terminated parental rights.

After the juvenile court ruled, counsel for CFS belatedly offered the PPR report into evidence. There was no objection, and the juvenile court admitted it.

II

THE DENIAL OF A BONDING STUDY AND VISITATION

The parents contend that the juvenile court violated due process by denying a bonding study and visitation.

7

A.    *Lack of Jurisdiction.*

CFS responds that, because our remittitur had not yet issued, the juvenile court had no jurisdiction to order a bonding study or visitation.

Subject to statutory exceptions, "'"[t]he filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and issuance of the remittitur" [citation] and deprives the trial court of jurisdiction to make any order affecting the judgment [citation].' [Citation.]" (*People v. Wagner* (2009) 45 Cal.4th 1039, 1061; accord, *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1499 (*Anna S.*).) "Issuance of a remittitur terminates the appellate court's jurisdiction over the case and revests jurisdiction in the trial court. [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2021) ¶ 14:2.)

*Anna S.* construed sections 302[4] and 385[5] as statutory exceptions to this rule, so that "[n]o matter the status of any related appellate proceeding, the juvenile court has the authority and duty to act to protect the safety of the child. [Citations.]" (*Anna S.*, *supra*, 180 Cal.App.4th at pp. 1501-1502.) We assume, without deciding, that this is correct.

---

[4]    Presumably the court was referring to section 302, subdivision (c), which provides: "When a child is adjudged a dependent of the juvenile court, any issues regarding custodial rights between his or her parents shall be determined solely by the juvenile court . . . so long as the child remains a dependent of the juvenile court."

[5]    Section 385 provides: "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside . . . ."

8

Here, however, the parents did not claim that either visitation or a bonding study was necessary "to protect the safety of the child," and it does not appear that they were. The order appealed from terminated parental rights; although our opinion reversed that order, until the remittitur issued, any order for visitation or a bonding study would affect the judgment by effectively restoring parental rights.

Thus, at the special hearing, the juvenile court had no jurisdiction to grant visitation or a bonding study. The mother's counsel even acknowledged that. She indicated that she wanted the juvenile court to address her requests "at the next hearing." However, she did not object when the trial court set a section 366.26 hearing as the next hearing.

The parents could and should have asked the court to hold a hearing on the issues of visitation and a bonding study *before* the section 366.26 hearing. At the section 366.26 hearing itself, the mother's counsel did belatedly request a continuance for this purpose. The parents, however, do not contend that the juvenile court erred by denying a continuance. And for good reason. The mother failed to file written notice of her motion at least two court days before the date set for hearing, as required; she also failed to show any good cause to excuse this requirement. (Cal. Rules of Court, rule 5.550(a)(4).)

"Moreover, continuances in juvenile court are disfavored. [Citation.]" (*In re M.M.* (2022) ___ Cal.App.5th ___, ___ [2022 Cal. App. LEXIS 602 at *9].) The juvenile court could properly reason that the mother should have objected when it set the section 366.26 hearing.

9

It follows that, even assuming for the sake of argument the juvenile court denied visitation and a bonding study for erroneous reasons, the error was harmless. At the special hearing, it could not have ordered visitation and a bonding study at all. At the second section 366.26 hearing, visitation and a bonding study would have required a continuance, which it properly denied. Certainly there was no due process violation.

B.      *Merits*.

Separately and alternatively, the juvenile court's reasons for denying a bonding study and visitation were legally correct.

1.      *Denial of a bonding study*.

"Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4.) "Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often 'an important source of information about the psychological importance of the relationship for the child.' [Citation.]" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 317.)

Nevertheless, "a bonding study . . . is not required as a matter of law . . . ." (*In re J.D.* (2021) 70 Cal.App.5th 833, 862.) "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order." (*In re Lorenz  C.* (1997) 54 Cal.App.4th 1330, 1339-1340.)

"The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have

10

reasonably refrained from ordering a bonding study. [Citation.]" (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.)

*In re Richard C.* (1998) 68 Cal.App.4th 1191 (*Richard C.*) held that a request for a bonding study made after termination of reunification services is belated and may be denied on that ground. (*Id*. at pp. 1195-1197.)

It explained: "'[A]lthough the preservation of a minor's family ties is one of the goals of the dependency laws, it is of critical importance only at the point in the proceeding when the court removes a dependent child from parental custody [citation]. . . . Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. [Citation.]' [Citation.]" (*Richard C.*, *supra*, 68 Cal.App.4th at p. 1195.)

"'At the time the court makes its determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent.' [Citations.]

"Bonding studies after the termination of reunification services would frequently require delays in permanency planning. Similar requests to acquire additional evidence in support of a parent's claim [of the parental-benefit exception] could be asserted in nearly every dependency proceeding where the parent has maintained some contact with the child. The Legislature did not contemplate such last-minute efforts to put off

11

permanent placement. [Citation.] While it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*Richard C.*, *supra*, 68 Cal.App.4th at pp. 1196-1197, fn. omitted.)

Here, the parents did not show any "compelling circumstances" that demanded a belated bonding study. Had they wanted a bonding study, they could have requested one before the *first* section 366.26 hearing. Thus, under *Richard C.*, the juvenile court did not abuse its discretion.

### 2. *Denial of visitation.*

After the juvenile court terminates reunification services and before it holds a section 366.26 hearing, parents are entitled to visitation, unless the juvenile court finds that visitation would be detrimental to the child. (§§ 366.21, subd. (h), 366.22, subd. (a)(3), 366.25, subd. (a)(3).) Here, the juvenile court essentially ruled that visitation would be detrimental — "it would be confusing to the kids to have stopped visits [and] start them again . . . ."

"Visitation orders in dependency cases are typically reviewed for abuse of discretion and will not be reversed absent a 'clear showing of an abuse of discretion.' [Citation.]" (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1119.)

Preliminarily, CFS argues that, because parental rights had been terminated, it, rather than the juvenile court, had exclusive authority over visitation. (See § 366.26,

12

subd. (j).)  However, we had reversed the order terminating parental rights.  As already discussed in part II.A, *ante*, at the special hearing, the juvenile court had no jurisdiction over visitation at all.  It could have ruled on the request for visitation after we issued our remittitur, but by then, parental rights were no longer terminated.

The parents argue that "[t]he denial of visitation was based on speculation . . . ."  However, the record showed that the most recent visits had been of poor quality, and thereafter visitation had stopped completely for nine months.  It was a reasonable inference that renewed visitation would be confusing to the children and would interfere with their burgeoning attachment to the prospective adoptive parents.

The parents also argue that the juvenile court's decision was speculative absent input from the children's therapist.  They forfeited this argument by failing to raise it below.  If they felt the therapist's opinion would be helpful (and not privileged), they were free to introduce it themselves.  They do not explain what legal principle obligated the trial court to consult the therapist sua sponte.

Finally, the parents claim that "neither CFS nor the children's counsel objected to the children visiting the parents while the section 366.26 hearing was pending . . . ."  That is not true.  Counsel for CFS did object, albeit based on lack of jurisdiction.  Minor's counsel was lukewarm — he said he did not "necessarily" object; he did not argue in favor of visitation.  In any event, a failure to object by counsel for CFS and the minors would not relieve the juvenile court of its duty to exercise its independent judgment on the issue, based on its view of the best interest of the children.

We therefore conclude that the juvenile court did not abuse its discretion by denying visitation.

## III

## ADMISSION AND CONSIDERATION OF THE PPR REPORT

The parents contend that the juvenile court violated due process by admitting and considering the PPR report. They claim that neither they nor their counsel had received the report, and, once it was admitted, they were not given an opportunity to respond to it. They also argue that the juvenile court erred by considering the report before it had been formally admitted.

They forfeited all of these contentions by failing to raise them below. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Among other things, the failure to object to evidence forfeits the argument that it was admitted erroneously. (Evid. Code, § 353, subd. (a).)

Understandably, then, they attempt to reframe the asserted error as a due process violation. However, a due process claim, too, can be forfeited by failure to raise it in the trial court. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222; *In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1491.) Admittedly, we have discretion to entertain a constitutional claim for the first time on appeal, but only if it presents a pure question of law. (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.) The parents' due process claim does not. It turns on whether they received a copy of the PPR report before the

14

hearing. The record does not rule out this possibility. Admittedly, they did not have a right to receive it (§ 302, subd. (b)); however, their counsel may have received it informally, before being relieved or after being reappointed. Moreover, whether the asserted error was prejudicial turns on whether the parents could have rebutted the information in the PPR report; we just don't know.

Separately and alternatively, the due process claim fails on the merits. "The touchstone of due process is fundamental fairness." (*Salas v. Cortez* (1979) 24 Cal.3d 22, 27.) "[T]he most basic concept of due process is the right to notice and a meaningful opportunity to be heard. [Citations.]" (*In re J.F.* (2011) 196 Cal.App.4th 321, 335.) Here, the juvenile court gave notice that intended to rely on the PPR report, and CFS gave notice that was seeking to admit it. The parents had an opportunity to object. The fact that the PPR report was offered after the court had already ruled did not prevent their counsel from speaking up. Thus, the hearing was not fundamentally unfair. Moreover, the parents do not claim that their counsel rendered ineffective assistance by failing to object.

IV

EXCLUSION OF THE MOTHER'S PROFFERED EVIDENCE

At the second section 366.26 hearing, the mother's counsel offered into evidence what she described as "a folder with numerous pages[,] . . . includ[ing] the status reports from the case highlighting the successful visits the parents had. There are two letters of

15

reference and multiple pictures of the children engaging with the parents." The juvenile court ruled: "I'm not going to do that. That's not the way evidence gets introduced."

In the introduction to her brief, the mother asserts that the exclusion of this evidence — at least, when combined with the admission of the PPR report — constituted a violation of due process. Accordingly, CFS argues that the juvenile court properly excluded this evidence.

The mother forfeited this claim by failing to support it with reasoned argument and citations to authority. (See *In re J.F.* (2019) 39 Cal.App.5th 70, 79-80.) Arguably, it is comprised within the caption of her brief saying that "[t]he court denied the parents the opportunity to prove the parental-benefit exception, while relying on Respondent's evidence to reject it." (Italics omitted.) The argument under that caption, however, discusses only the denial of visitation and of a bonding study. Nowhere else does she explain how the exclusion of her proffered documents was supposedly a violation of due process.

We do not mean to suggest that, if not forfeited, this claim would have merit. The proffered documents were never properly authenticated. (See Evid. Code, §§ 1400, 1401, subd. (a).) The juvenile court therefore correctly excluded them. Moreover, the mother cannot show prejudice because her counsel did not have the documents marked as exhibits or otherwise made part of the record. (See Evid. Code, § 354, subd. (a).)

16

## V

## PREJUDGMENT

The parents contend that they were denied due process because the juvenile court had already made up its mind that the parental-benefit exception did not apply.  They point to its comments at the special hearing, when it explained that it was denying visitation and a bonding study, in part because:  "I don't believe there is the substantial bond under Caden C."  "I think the evidence is what it is and what I heard already."

The parents forfeited this contention by failing to raise it below.  (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

They also forfeited it by failing to file a writ petition.  Improper prejudgment is a form of judicial bias.  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 389 ["'Impartiality' entails . . . [the] maintenance of an open mind.'  [Citation.]"].)  An appellate court can review a claim of judicial bias only by writ, not by appeal.  (Code Civ. Proc., § 170.3, subd. (d).)  This is true even when the claim is couched in terms of a denial of due process.  (*People v. Lucas* (2014) 60 Cal.4th 153, 304, disapproved on unrelated grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

We hasten to add that the parents have not shown so much as a hint of prejudgment.  There had already been a section 366.26 hearing; at that hearing, the juvenile court had already found that the parental-benefit exception did not apply.  When the parents requested visitation and a bonding study, they did not introduce any new evidence or claim any changed circumstances.  Hence, the juvenile court was entitled to

rely on the evidence it had already heard. It did not have to pretend the previous proceedings in the case had not happened. Its reliance on that evidence fails to show that it would have refused to consider new evidence, if the parents had offered any. Indeed, at the section 366.26 hearing, it *did* consider new evidence — the PPR report. It also fails to show that it did not fairly consider the arguments raised at the section 366.26 hearing. The juvenile court cited *Caden C.*, showing that it did reevaluate the evidence it had already heard in light of that case, exactly as we directed it to do.

VI

THE SUFFICIENCY OF THE EVIDENCE

The parents contend that the evidence does not support the juvenile court's finding that that the parental-benefit exception did not apply.

A. *Additional Factual Background.*

At the section 366.26 hearing, a total of six social workers' reports were introduced into evidence. We confine our consideration to that evidence. (See *In re L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 207-208.)[6]

_____

[6] One of the items *not* introduced was the mother's testimony at the first section 366.26 hearing. Nevertheless, the juvenile court did consider the mother's former testimony; however, it concluded, "I find the reports to be more credible than the mother's testimony . . . ."

18

1. *Visitation before termination of reunification services.*

The parents had had visitation, supervised by the caregiver, for two hours once a week.[7] The mother also did some video visits. Before reunification services were fully terminated, the parents behaved appropriately. The children enjoyed the visits. In late 2019, N. and G. said "they 'want to see mom and dad more.'" The parents were attentive to L.'s needs, feeding her and changing her diaper, and appeared to be developing a bond with her.

2. *Visitation after termination of reunification services.*

After reunification services were fully terminated, in February 2021, there is no evidence that the children enjoyed the visits. During visits, the father "was repeatedly going to the restroom, appeared sleepy and sometimes nodding off, and was not being attentive to the children."

Once, while taking the two older children to the restroom, the mother told them "not to tell the worker anything, the social worker is a liar and that is why they are not going home." When the social worker told her this was "inappropriate," she was "not receptive"; she "responded that she is not talking about the case but telling her children the truth that they aren't going home because of the social worker."

During one video visit, both "parents appeared under the influence, as they were slurring words . . . ."

---

**7** At one point, visitation was increased to four hours a week, but it soon was reduced back to two hours a week.

19

As a result of these issues with visitation, CFS required that visits take place at a CFS office and be supervised by a CFS employee.

During subsequent visits, the prospective adoptive mother reported, G. was "struggling." It was hard to redirect her. She had tantrums "often," "crying, laying on the floor, and isolating herself in a corner of the room." After visits, she had "a difficult time adjusting . . . ." She would cry, scream, and "withdraw[] for an hour or more . . . ." N. and G. would "argue more often after visits on the way home in the car." Hence, as of the first section 366.26 hearing, CFS was recommending that visitation be reduced to once a month if the hearing was continued.

Between the termination of their parental rights at the first section 366.26 hearing, in June 2021, and the second section 366.26 hearing, in March 2022, the parents had no visitation.

The children had been placed with the prospective adoptive parents since August 2020 — i.e., for more than a year and a half. As of November 2021, "[t]he children [we]re affectionate with the [prospective adoptive parents] and appear[ed] comfortable in the home. The children . . . view[ed] the [prospective adoptive parents] as their parental figures."

B.     *Legal Background.*

"""[A]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child — adoption, guardianship or long-term foster care." [Citation.] At this stage of the dependency proceedings, adoption is preferred

20

because it ensures permanency and stability for the minors. [Citations.]' [Citation.] Thus, as a general rule, at a section 366.26 hearing, if the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights. [Citation.]

"However, there are several exceptions to this rule. [Citation.] One such exception applies if '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.]

"The leading California Supreme Court case regarding the parental-benefit exception is *Caden C.*, *supra*, 11 Cal.5th 614. Under *Caden C.*, to establish the parental-benefit exception, a parent must prove three elements: '(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child.' [Citations.]

"In 'assess[ing] whether "the child would benefit from continuing the relationship," . . . the focus is the child. . . . [T]he relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]' [Citation.]

"'[I]n assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs

21

the benefit to the child of placement in a new adoptive home.  [Citation.]'  [Citation.] The court must ask, 'does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]"  [Citation.]'  [Citation.]

"'[A] substantial evidence standard of review applies to the first two elements.' [Citation.]  But 'the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion.'  [Citation.]  'A court abuses its discretion only when ""'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."'"  [Citation.]'  [Citation.]"  (*In re L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 205-207, italics omitted.)

As mentioned, the parents had the burden of proving that the parental-benefit exception applied.  "'[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'  [Citation.]"  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

22

C.    *Discussion.*

The juvenile court could reasonably find that the parents failed to show detriment. Although visitation before the termination of reunification services was positive, thereafter, it became fraught. The father failed to be attentive to the children. The mother talked to the children about the case; she told them it was the social worker's fault that they could not go home. The behavior of both G. and N. deteriorated after visits. There was no evidence that the children enjoyed these later visits or benefited from them.

The parents complain that "[u]nfortunately, as is so often the case, once reunification services are terminated and a .26 hearing is set, all descriptions of positive interaction between parents and children disappear from WIC reports when the Department recommends the children be freed for adoption." This ignores the fact that they had the right to present evidence regarding the quality of the visits. If they felt the social workers' reports were one-sided, they were free to call themselves, the social worker, and even the children. The juvenile court did, in fact, consider the mother's testimony from the first section 366.26 hearing, although it found it not credible.

Moreover, as CFS points out, because parental rights had actually been terminated once, we have "unique insight" into the likelihood of detriment. There was no evidence that, during the nine months after termination, the children missed the parents at all. Rather, they viewed the prospective adoptive parents as their "parental figures."

The parents argue that the trial court erred by "focus[ing] . . . on a small portion of the case . . . ." However, the juvenile court did not ignore the earlier reports. To the

23

contrary, it said, "So while I think there are positive mentions in the life of the case, the Court has to look at the entirety of the situation." It could rationally focus on the later evidence because, when compared with the earlier evidence, it showed a trend of deteriorating visitation.

The period between termination of reunification services and the first section 366.26 hearing was four months. The juvenile court could reasonably assume that, if the children were benefiting from visitation, that was enough time for that fact to be manifest. Likewise, the period between the first section 366.26 hearing and the second section 366.26 hearing was nine months. The juvenile court could reasonably assume that, if the children were suffering detriment from termination, there would have been some evidence of that fact.

The parents also argue that the juvenile court erroneously "assumed the children's behaviors were due to their interactions with the parents." They suggest that the children's poor behavior could have been due to "the change in visitation setting" or "the children learn[ing] they were not returning to the parents." It is true that G. also had tantrums that were unrelated to visitation. She had been diagnosed as having oppositional defiant disorder and an acute stress reaction. She was being treated with therapy and psychotropic medication. Nevertheless, according to the prospective adoptive mother — who would have been familiar with G.'s ordinary behavior — G. not only had tantrums during visits but also "struggle[d]" during visits and had "a difficult

24

time adjusting" after visits. Moreover, G. and N. argued more than usual on the way home after visits.

The juvenile court could properly reason that, if the children really benefited from spending time with the parents, then visits at a CFS office (presumably designed for visitation) would be just as beneficial as they were at a park. And, although the juvenile court had terminated reunification services and set a section 366.26 hearing, there is no evidence that the children were *told* that this would mean that they would not be returned to the parents. In the report for the first section 366.26 hearing, the social worker said, "The children are too young to fully understand these proceedings."

We therefore conclude that the juvenile court did not err in finding that the parental-benefit exception did not apply.

VII

VIOLATION OF *CADEN C.*

In their reply briefs, the parents contend that the juvenile court violated *Caden C.* by "compar[ing] the attributes of the custodial caretaker relative to those of the parents." They forfeited this contention by failing to raise it in their opening briefs. (*In re J.N.* (2006) 138 Cal.App.4th 450, 459, fn. 5.) In any event, it lacks merit. In support, they cite page 17 of the reporter's transcript of the *first* section 366.26 hearing. That page

25

does not show that the court did compare the parents to the caretaker.[8]  More fundamentally, any such error at *that* hearing was cured by our reversal and remand.

## VIII

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

MILLER _____
J.

FIELDS _____
J.

---

**8**　　This is not a typo for page 17 of the *second* section 366.26 hearing, because that page does not support the claim, either; in fact, on that page, the juvenile court did not speak.